# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **FACTORY MUTUAL INSURANCE COMPANY**, a Rhode Island corporation, | Case No. 16-cv-264-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **PERI FORMWORKS SYSTEMS, INC.**, a Maryland corporation, | |
| Defendant and Third-Party Plaintiff, | |
| v. | |
| **MCCLONE CONSTRUCTION CO.**, a California corporation, | |
| Third-Party Defendant. | |

Stuart Duncan Jones, BULLIVANT HOUSER BAILEY, PC, 300 Pioneer Tower, 888 S.W. Fifth Avenue, Portland, OR 97204. Of Attorneys for Plaintiff Factory Mutual Insurance Company.

Robert W. Wilkinson, Angela M. Otto, Kyle A. Sturm, and Nicholas A. Thede, BALL JANIK LLP, 101 S.W. Main Street, Suite 1100, Portland, OR 97204. Of Attorneys for Defendant and Third-Party Plaintiff PERI Formworks Systems, Inc.

Samuel K. Anderson and Jonathan Henderson, DAVIS ROTHWELL EARLE & XÓCHIHUA, P.C., 200 S.W. Market Street, Suite 1800, Portland, OR 97201. Of Attorneys for Third-Party Defendant McClone Construction Co.

**Michael H. Simon, District Judge.**

Plaintiff Factory Mutual Insurance Company ("Factory Mutual") sued Defendant PERI Formworks Systems, Inc. ("PERI") in state court, seeking reimbursement from PERI for payment Factory Mutual made under a Builder's Risk insurance policy. PERI removed the case to federal court under diversity jurisdiction and brought a third-party complaint against McClone Construction Co. ("McClone"). PERI alleges that any harm to Factory Mutual for which PERI may be liable is the result of McClone's negligence or fault and that McClone is obligated to indemnify PERI under PERI's contract with McClone.

Before the Court is McClone's motion for summary judgment against PERI's third-party claims. McClone argues that Factory Mutual is asserting claims against PERI as a subrogee of McClone because McClone is an insured in the policy under which Factory Mutual made the payments for which it is seeking reimbursement. Because it is an insured, McClone argues, a doctrine known as the "antisubrogation rule" bars PERI's claims. McClone adds that even if it were not an insured under the policy, Factory Mutual's claim against PERI would still necessarily fail and because PERI's third-party complaint is derivative it too must fail. PERI responds to McClone's first argument by asserting that McClone is not an insured under the relevant policy, and thus the antisubrogation rule does not apply. For the reasons discussed below, the Court finds that McClone is an insured under the Builder's Risk policy at issue and thus the antisubrogation rule applies. Accordingly, the Court grants McClone's motion for summary judgment. Because the Court finds that McClone is an insured, the Court does not reach McClone's alternative argument that even if McClone were not an insured, PERI necessarily would prevail against Factory Mutual's claims, rendering moot PERI's derivative claims against McClone.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND[1]

This case involves a dispute arising out of the construction of a building on the Hillsboro Oregon campus of Intel Corporation ("Intel"). A problem developed during the pouring of certain concrete floors. Construction was halted, the already-poured concrete was broken and discarded, the shoring and concrete forms were adjusted, and new concrete was poured. This caused a loss for two of the contractors on the project, Turner Construction Company ("Turner"), the general contractor, and McClone, a subcontractor.

---

[1] The general background of the dispute is set forth in this section. The relevant provisions of the specific documents at issue are described and discussed in the next section.

One aspect of the project for which Turner hired McClone related to the concrete flooring. McClone, in turn, subcontracted with PERI to provide, among other things, design services, advice, and oversight for the use of certain equipment owned by PERI in the construction of the building, including the shoring and supports for the concrete floor.

Intel sponsored an Owner Controlled Insurance Program ("OCIP") for the construction project. Marsh Risk & Insurance Services ("Marsh") administered the OCIP. Approved Contractors could participate in the OCIP. Both Turner and McClone enrolled in the OCIP as approved contractors. The OCIP included insurance coverage for worker's compensation, general liability, and builder's risk. On September 18, 2013, McClone received a Certificate of Liability Insurance ("Certificate") under the OCIP. PERI did not enroll in the OCIP.

Factory Mutual provided the relevant OCIP Builder's Risk insurance policy. After a claim was made and adjusted under that policy, Factory Mutual paid $1,681,888.90. According to the OCIP, for claims made under the Builder's Risk policy, loss shall be payable to Intel as "Trustee for all insured parties," and Intel shall "coordinate distribution of insurance proceeds." ECF 24-1 at 14. Intel instructed Factory Mutual to make payment directly to Turner and McClone. Accordingly, Factory Mutual paid $1,108,639.40 to McClone and $573,249.50 to Turner, as losses relating to the concrete floor. Factory Mutual then commenced this action as subrogation claim against PERI, alleging that the loss was caused by PERI's negligence. PERI, in turn, asserted third-party claims against McClone for contractual indemnity and statutory contribution.

## DISCUSSION

McClone argues that it is entitled to summary judgment under the antisubrogation rule. This rule prohibits an insurer from seeking subrogation from its own insured. McClone argues that because Factory Mutual is asserting its claims against PERI as a subrogee of McClone and

"while standing in McClone's shoes," PERI's attempt to hold McClone liable for any damages for which PERI may be found to owe Factory Mutual is essentially seeking to hold McClone liable to its insurer. This case involves an unusual procedural posture for the application of the antisubrogation rule. Here, the insurance company is not directly seeking contribution from its insured. Instead, the insurance company plaintiff is suing a defendant that is not the plaintiff's insured, but the defendant is then seeking indemnity and contribution, to the extent the defendant may be liable to the insurance company, from a party that contends it is an insured of the plaintiff. The third-party defendant, McClone, argues that this procedural posture does not affect the application of the antisubrogation rule because the outcome is still the same: assuming that McClone is an insured of the plaintiff, an insured is being asked ultimately to pay its insurance company for losses covered by an insurance policy. Such a result is prohibited by the antisubrogation rule.

McClone further moves for summary judgment against PERI's claim that McClone has a duty to defend PERI against Factory Mutual's claims, based on the separate contract between McClone and PERI. McClone argues that no duty to defend has been triggered because Factory Mutual has not alleged that McClone was negligent, nor could Factory Mutual maintain such an allegation in light of the antisubrogation rule.

PERI does not dispute that if McClone is an insured under the Builder's Risk policy, the antisubrogation rule would bar PERI's third-party claim against McClone. Instead, PERI argues that based on the unambiguous text of the Builder's Risk policy issued by Factory Mutual, McClone is not an insured under that policy. PERI asserts that only Intel (including certain of its affiliates) is an insured under Factory Mutual's Builder's Risk policy. Thus, the primary question for the Court is whether McClone is an "insured" under Factory Mutual's Builder's Risk policy.

PAGE 5 – OPINION AND ORDER

In addition, PERI argues that regardless of whether McClone is an insured, McClone's duty to defend has been triggered.

### A.  Standards for Interpreting Insurance Policies

#### 1.  Governing Law

Both parties agree that Oregon law applies in interpreting the Builder's Risk policy. Although the Builder's Risk policy does not contain an express choice of law provision, it directs a court to look, at least in certain circumstances, to the insurance law of the jurisdiction in which the relevant insured property is located. *See* ECF 24-6[2] at 32[3] ¶ 9 (stating in a provision entitled "Suit Against the Company" that "[i]f under the insurance laws of the jurisdiction in which the property is located" the statute of limitations contained in the policy is invalid, then the statute of limitations will be the limit of time permitted by that state law); ECF 24-6 at 34 ¶ 3 (explaining in a provision entitled "Provisions Applicable to Specific Jurisdiction" that the policy will be deemed to include any provisions required by the states in the insured location and that state-specific endorsements serve to modify the policy with respect to insured property located in that state).

Here, the property at issue is located in Oregon. Further, because this is a diversity case, state substantive law applies. *See Conrad v. Ace Prop. & Cas. Ins. Co.*, 532 F.3d 1000, 1004 (9th Cir. 2008) (noting in a case involving contract interpretation that "[b]ecause federal jurisdiction in this case is based on diversity of citizenship, we apply the substantive law of the state"). The Court thus applies Oregon law in interpreting the Builder's Risk policy.

---

[2] Policy No. US435, issued December 31, 2013 ("Builder's Risk policy").

[3] Page number citations are to the ECF pagination, not to the internal pagination of the cited document.

### 2.  Oregon Insurance Contract Interpretation

In Oregon, the interpretation of an insurance policy is a question of law. *Hoffman Construction Co. v. Fred S. James & Co.*, 313 Or. 464, 469 (1992); *Capitol Specialty Ins. Corp. v. Chan & Lui, Inc.*, 248 Or. App. 674, 680 (2012). Further, the court must determine the intent of the parties to an insurance policy based on the terms and conditions stated in the policy. *Hoffman*, 313 Or. at 469; *see also* Or. Rev. Stat. § 742.016 (providing that "every contract of insurance shall be construed according to the terms and conditions of the policy"). In making this determination, the court uses a three-step process. *Hoffman*, 313 Or. at 469.

First, if the terms of the policy are unambiguous, the analysis ends and the unambiguous terms control. *Andres v. Am. Standard Ins. Co. of Wis.*, 205 Or. App. 419, 423 (2006). In considering whether a term is ambiguous, if the text of the policy includes a definition, a court must construe the policy in accordance with that definition. *Id.* If the policy does not define the disputed term, the court looks to "'ordinary meaning' and other aids to construction." *Id.* at 424. "The first aid to interpretation is determining whether the term at issue has a *plain* meaning. The meaning of a term is 'plain'—that is, unambiguous—if the term is susceptible to only one plausible interpretation." *Groshong v. Mut. of Enumclaw Ins. Co.*, 329 Or. 303, 308 (1999)) (emphasis in original). If the term has only one plausible interpretation, the "parties' intent conclusively is established, and our interpretive inquiry is at an end." *Id.* Notably, however, "given the breadth and flexibility of the English language, the task of suggesting plausible alternative meanings is no challenge to capable counsel. Competing plausible interpretations simply establish ambiguity that will require some interpretive act by the court." *Hoffman*, 313 Or. at 470.

Second, if a term has more than one plausible interpretation and thus is ambiguous, the court next examines the term in light of the "particular context in which that term is used in the

policy and the broader context of the policy as a whole." *Id.* Finally, "[i]f the ambiguity remains after the court has engaged in those analytical exercises, then 'any reasonable doubt as to the intended meaning of such [a] term[ ] will be resolved against the insurance company and in favor of extending coverage to the insured.'" *N. Pac. Ins. Co. v. Hamilton*, 332 Or. 20, 25 (2001) (quoting *Shadbolt v. Farmers Ins. Exch.*, 275 Or. 407, 411 (1976) (alterations in original)); *see also Anderson Bros., Inc. v. St. Paul Fire & Marine Ins. Co.*, 729 F.3d 923, 931 (9th Cir. 2013) ("If the parties' intent cannot be determined by doing so, the policy is construed against the insurer, because 'any reasonable doubt as to the intended meaning of [an ambiguous] term will be resolved against the insurance company and in favor of extending coverage to the insured.'" (alterations in original) (quoting *Hamilton*, 332 Or. at 25) (applying Oregon law)).

## B.  The Relevant Provisions

### 1.  Provisions of the Builder's Risk Policy

The Definition section of the Builder's Risk policy does not define either "insured" or "named insured." ECF 24-6 at 38-41 ¶ 13. The cover, or declarations, page, however, lists only "Intel Corporation" in the box labelled "INSURED." *Id.* at 1. Additionally, the Declarations section of the policy states:

> **1. NAMED INSURED AND MAILING ADDRESS**
>
> Intel Corporation and any subsidiary, and Intel Corporation's interest in any partnership or joint venture in which Intel Corporation has management control or ownership as now constituted or hereafter is acquired, as the respective interest of each may appear, all hereafter referred to as the "Insured," including legal representatives.

*Id.* at 7 (emphasis in original).[4]

---

[4] For ease of reference, the Court refers to Intel's subsidiaries as well as Intel's interests in any partnership or joint venture in which Intel Corporation has management control or ownership collectively as Intel's "affiliates."

Later, the Declarations section provides:

### 6. LOSS ADJUSTMENT/PAYABLE

Loss, if any, will be adjusted with and payable to Intel Corporation, or as may be directed by Intel Corporation.

Additional insured interests will also be included in loss payment as their interests may appear when named as additional named insured, lender, mortgagee and/or loss payee either on a Certificate of Insurance or other evidence of insurance on file with the Company or named below.

When named on a Certificate of Insurance or other evidence of insurance, such additional interests are automatically added to this Policy as their interests may appear as of the effective date shown on the Certificate of Insurance or other evidence of insurance. The Certificate of Insurance or other evidence of insurance will not amend, extend or alter the terms, conditions, provisions and limits of this Policy.

*Id.* at 8 (emphasis in original).

In the Property Damage section of the Builder's Risk policy, the Property Insured is described as:

This Policy insures Real Property and Personal Property intended to become a permanent part of, or consumed in, the fabrication, assembly, installation, erection or alteration of the Insured Project, unless otherwise excluded elsewhere in this Policy, located at an **insured location** or within 1,000 feet/300 metres thereof, to the extent of the interests of the Insured in such property.

This Policy also insures the interest of contractors and subcontractors that are enrolled in the Intel Corporation sponsored Owner Controlled Insurance Program (OCIP), in insured property during construction at an **insured location** or within 1,000 feet/300 metres thereof, to the extent of the Insured's legal liability for insured physical loss or damage to such property. Such interest of contractors and subcontractors that are enrolled in the Intel Corporation sponsored Owner Controlled Insurance Program (OCIP) is limited to the property for which they have been hired to perform work.

*Id.* at 13 (emphasis in original).

PAGE 9 – OPINION AND ORDER

### 2.  Provisions of Intel's OCIP Manual

Marsh, the administrator of Intel's OCIP, produced a "Policies, Procedures and Guidelines Manual" on the construction project at issue (the "Manual"). ECF 24-1. The Manual states that its purpose is to provide general information regarding the insurance afforded under the OCIP. *Id.* at 3. The Manual informs contractors and subcontractors that the OCIP provides a certain level of coverage and that the contractors may carry "additional insurance" if they deem it necessary. *Id.* The Manual explains that Intel "does not warrant or represent that the OCIP coverage constitutes an insurance portfolio which adequately addresses all the risk faced by the Contractor and Subcontractors" and that contractors should satisfy themselves as to the adequacy of the provided OCIP coverage. *Id.* at 6.

The Manual also states that the "Project Site" is defined "[f]or the purpose of affording coverage to approved OCIP participants." *Id.* at 5. The Manual explains that the Builder's Risk insurance provides "property damage coverage on a replacement cost basis" for loss to "all materials, supplies, equipment or other property by OCIP Contractors which is, or will be, incorporated into the Project prior to the date of Final Completion." *Id.* at 6.

In describing the enrollment procedures, the Manual provides that contractors must submit complete applications with all required information in order to permit "approval of your enrollment and issuance of your insurance policy." *Id.* at 7. The Manual further explains that upon approval, Marsh will furnish approved contractors with a Certificate of Insurance "evidencing Commercial General and Excess Liability, Worker's Compensation and Builder's Risk coverages." *Id.* A Worker's Compensation policy will be issued by the insurance company directly to each contractor, but the remaining policies, including Builder's Risk, only will be on file with Intel and available for review by approved contractors. *Id.*

The Manual notes that although Intel will pay the full insurance premium, an approved contractor will be responsible for a share of the premium and that such amount will be deducted from the contractor's bid and from any change orders. *Id.* at 8. Finally, the Manual provides a specific procedure for reporting claims under the Builder's Risk policy, including tasks the contractor must perform. *Id.* at 13-14. This section also explains that "Loss, if any, under Builder's Risk policies shall be adjusted with, and payable to, Intel Corporation as Trustee for all insured parties. Intel Risk Management shall coordinate distribution of insurance proceeds." *Id.* at 14.

### 3.  Analysis

#### a.  Step one analysis: Whether the term "Insured" is ambiguous

The parties dispute the meaning of the term "Insured" in the Builder's Risk policy and whether McClone is entitled to coverage under the policy. The term "Insured" is not defined in the Definitions section of the policy. Thus, the Court looks to whether that word has a plain meaning—namely, whether it is susceptible to only one plausible interpretation. *Groshong*, 329 Or. at 308. The Court finds that the term "Insured" does not have a plain meaning that is sufficient to resolve the dispute before the Court. Although the declarations page lists only Intel and its affiliates as a named insured, neither the word "insured" nor the term "named insured" are defined terms, and other portions of the Builder's Risk policy show that contractors and subcontractors will have their interests insured under the OCIP when certain conditions are met. Thus, the Court moves to step two of Oregon's framework for interpreting insurance contracts.

#### b.  Step two

##### i.  Context: How "Insured" is used in the Builder's Risk policy

PERI primarily relies on two provisions to support its interpretation that "Insured" means only Intel (and its affiliates) and thus McClone is not entitled to coverage under the policy. First,

PERI relies on the Property Insured clause, which states that the interest of contractors and subcontractors are only covered "to the extent of the *Insured's* legal liability for insured physical loss or damage to [] property." ECF 24-6 at 13 ¶ 1 (emphasis added). Then, PERI relies on paragraph one in the Declarations section, which states that Intel and its affiliates are "all hereafter referred to as the 'Insured.'" *Id.* at 7 ¶ 1. From this, PERI concludes, Intel is the only "Insured" and McClone is entitled to coverage under the policy only to the extent that *Intel* is legally liable for the property damage resulting from the allegedly defective concrete work. PERI adds that no one asserts that Intel is legally liable for the concrete damage and thus McClone is not entitled to any coverage under the policy.

PERI's interpretation of the Property Insured clause is unreasonable. If the Property Insured clause only covers losses to the extent of Intel's legal liability for the loss, then there is no "interest" of the contractors and subcontractors that is being insured under the policy. The Property Insured clause states that the policy "also insures the interest of [OCIP-enrolled] contractors and subcontractors" and that this insured interest is "limited to the property for which [the contractors and subcontractors] have been hired to perform work." *Id.* at 13 ¶ 1. This text would be rendered meaningless under PERI's interpretation that the property is only insured to the extent of Intel's legal liability because that is not insuring the contractors' and subcontractors' interest; it is insuring only Intel's interest. When interpreting insurance contracts, courts must "assume that parties to an insurance contract [did] not create meaningless provisions." *Hoffman*, 313 Or. at 472.

In addition, McClone argues that the term "Insured" is not limited to Intel and its affiliates. McClone notes that the clause discussing Intel and its affiliates is titled "Named Insured" and that later in the policy the term "Named Insured" is used. Thus, according to

McClone, the term "Insured" must necessarily refer to something other than simply the "Named Insured." McClone's argument also is not persuasive. Although the heading of the relevant paragraph states "Named Insured," the clause itself states that Intel and its affiliates shall be referred to as "Insured," not "Named Insured."

McClone, however, also argues that the Loss Adjustment clause demonstrates that approved contractors are automatically added as "Insureds" under the policy and thus the term "Insured" must be understood as including such enrolled contractors. This provision, paragraph six of the Declarations section, states that additional insured interests are included when named on a Certificate of Insurance, and that once named on a Certificate of Insurance "such additional interests are automatically added to this Policy." *Id.* at 8 ¶ 6.

The Court agrees with McClone's argument that under the Loss Adjustment clause, contractors and subcontractors are automatically added as "Insureds" under the policy when, among other things, they have been issued a Certificate of Insurance. The clause under the policy provides that "additional interests" are added to the policy when a party is "named as [an] additional named insured" on a Certificate of Insurance. *Id.* The parties do not dispute that McClone was issued a Certificate that named McClone as an "Insured" and specifically identified the Builder's Risk policy—by policy number[5]—as a policy that has "been issued to the insured named above [McClone] for the policy period indicated." ECF 24-5 at 1. Although this Certificate, by itself, does not alter or amend any term of the Builder's Risk policy, it does satisfy the requirements contained in the Builder's Risk policy to show that the benefits of that policy have been "issued" to McClone.

---

[5] The policy number listed on the Certificate of Liability Insurance, US328, was later changed to US435. *See* ECF 24-6 at 1 (noting that Policy No. US435 had a previous policy number of US328).

This situation, therefore, is distinguishable from cases in which courts have found certificates of insurance to be ambiguous regarding whether they add a party as an additional insured when the certificate did not expressly identify the underlying insurance policy. *See WH Holdings, L.L.C. v. Ace Am. Ins. Co.*, 574 F. App'x 383, 388 (5th Cir. 2014) (finding ambiguous whether certificate of insurance added the plaintiff as an additional insured party because "the manuscript text in the comment section of the Certificate listing WH Holdings as an additional insured does not reference a specific policy from among several listed on the face of the Certificate"). The Court here finds that there is no reasonable interpretation of the relevant portion of the Loss Adjustment clause other than providing that after McClone is named as an additional insured on its Certificate, McClone is automatically added as an insured under the Builder's Risk policy. This does not alter or detract from the Declarations section noting that Intel and its affiliates are referenced as the "Insured" because it merely adds to who is included in the term "Insured" and does not preclude or deny Intel and its affiliates also from being included within that term.

The use of the word "Insured" in other provisions of the policy also supports the reasonableness of McClone's interpretation. For example, the Loss Adjustment and Settlement provision creates obligations on the "Insured" that, in context, appear only to make sense if the contractor or subcontractor doing the work is included as an additional insured. ECF 24-6 at 30. These obligations include providing verified plans and descriptions, separating the damaged and undamaged property, furnishing a complete inventory of damage and undamaged property, protecting the property from further damage, and submitting to examination under oath regarding the damage. *Id.*

Additionally, the Builder's Risk policy provides coverage for physical damage caused by defective work. *Id.* at 17 ¶ 3.C. Because Intel is not performing the work, Intel likely would not be liable for any defective work. PERI's interpretation that Intel and its affiliates are the only Insureds and that property loss is covered only to the extent that Intel and its affiliates are legally liable for the loss would render the policy's express coverage for physical damage from defective work essentially meaningless.

There are, however, some instances of the term "Insured" in the Builder's Risk policy where the context supports PERI's conclusion that Intel and its affiliates are the only Insureds, without the addition of contractors and subcontractors. These include the clauses permitting the "Insured" to request changes to or cancel the policy and to elect not to repair or replace lost property. *See id.* at 20 ¶ 5.D.7, 34 ¶ 1, 37 ¶ 8. The use of "Insured" in these few provisions, however, is insufficient to create an ambiguity in the meaning of the term "Insured" after considering its use throughout the policy. Rather, it shows only that policy was not particularly well written.

### ii.  Context: The Builder's Risk policy "as a whole"

Considering the purpose of a builder's risk policy and generally who is an insured in these types of insurance policies further supports interpreting "Insured" as including OCIP-approved contractors and subcontractors. Notably, "[a] builder's risk policy ordinarily indemnifies a *builder or contractor* against the loss of, or damage to, a building he or she is currently in the process of constructing." 1 COUCH ON INS. § 1:53 "Builder's Risk" (2016) (emphasis added); *see also One Place Condo., LLC v. Travelers Prop. Cas. Co. of Am.*, 2015 WL 2226202, at *3 (N.D. Ill. Apr. 22, 2015) ("'Builder['s] risk' insurance is a unique form of property insurance that typically covers only projects under construction, renovation, or repair and insures against accidental losses, damages or destruction of property for which the insured

has an insurable interest . . . . The purpose of builder's risk insurance is to compensate for loss

due to physical damage or destruction caused to the construction project itself.'" (quoting

*Fireman's Fund v. Structural Sys. Tech., Inc.*, 426 F. Supp. 2d 1009, 1025 (D. Neb. 2006))). A

builder's risk policy "protects those who have an insurable interest in a building that is under

repair, renovation, or construction," and "the parties who might conceivably have 'an insurable

interest' in a property under construction are generally much greater in number than is the case

with existing structures. Contractors, subcontractors, and materialmen all potentially have an

interest in a construction project." 4 BRUNER & O'CONNOR CONSTRUCTION LAW § 11:418. Thus,

builder's risk policies are intended to shift risk of loss from the builders (*i.e.*, the contractors and

subcontractors) onto the insurer. If Intel and its affiliates are the only insureds, the Builder's Risk

policy would fail in this primary purpose.

Further, an OCIP, a type of "wrap-up" insurance program, "seeks to distribute, share, and

manage risk at construction sites." *Kraft Co. v. J & H Marsh & McLennan of Florida, Inc.*, 2006

WL 1876995, at *1 (M.D. Fla. July 5, 2006). Policies under such programs "'generally cover[]

the owner or developer, the contractors and subcontractors, and potentially others such as

architects and engineers. A typical program will include builders risk, general liability, and

workers compensation/employers liability insurance.'" *First Mercury Ins. Co. v. Waterside

Condo. Ass'n*, 2013 WL 6383883, at *9 (D. Or. Dec. 5, 2013) (quoting Scott M. Seaman & Jason

R. Schulze, ALLOCATION OF LOSSES IN COMPLEX INSURANCE COVERAGE CLAIMS § 16:3 (2013));

*see also Guarantee Ins. Co. v. Old Republic Gen. Ins. Corp.*, 2012 WL 4468352, at *1 (S.D. Fla.

Sept. 26, 2012) ("Wrap-up insurance programs provide a single source for construction insurance

that covers all the contractors and subcontractors on a project. . . . Under an OCIP, the property

owner procures one set of insurance policies for a fixed premium that insure most of the

PAGE 16 – OPINION AND ORDER

companies working on the project, and attempts to recover the premium through the contractors and subcontractors."); *Kraft Co.*, 2006 WL 1876995, at *1 ("In a traditional standard construction contract scenario, all contractors, including the prime and subcontractors, would be responsible to procure individual insurance coverage. The CCIP allows a single insurance carrier to provide the varying coverage for all contractors at a single construction site."). Accordingly, in the context of OCIPs, contractors and subcontractors are provided coverage and are insureds under the various policies, including builder's risk policies.

Finally, the fact that the contractors and subcontractors, including McClone, are required to pay their share of the insurance premiums provides additional context that these contractors and subcontractors are insureds under the policies. It would be unreasonable to conclude that contractors and subcontractors would be expected to pay a portion of insurance premiums if they were not also insureds and entitled to coverage under the policies.

Thus, the Court finds at step two in Oregon's framework for interpreting insurance contracts that the term "Insured" as used in the Builder's Risk policy means Intel and its affiliates as well as all OCIP-approved enrolled contractors and subcontractors, and this includes McClone. Further, even if the Court were unable to resolve this meaning of "Insured" at step two, then either by considering extrinsic evidence or moving to step three, the Court would reach the same conclusion in favor of McClone.

### c.  Extrinsic evidence

At oral argument, PERI and McClone agreed that if the Court finds that who is an "insured" under the policy is ambiguous after considering the four corners of the Builder's Risk policy, the Court may consider extrinsic evidence. In reaching this agreement, these parties referenced the Oregon Court of Appeals' decision in *Fred Shearer & Sons, Inc. v. Gemini Insurance Co.*, 237 Or. App. 468 (2010). That case held that when determining whether a duty to

PAGE 17 – OPINION AND ORDER

defend has been triggered, which normally restricts a court to consider only the four corners of

the complaint and the insurance policy, a court may look to extrinsic evidence if the sole

question is whether the plaintiff is an insured. *Id.* at 476-77. The court in *Shearer* explained that

it did "not see the logic" in precluding the plaintiff from using extrinsic evidence when the issue

is whether the plaintiff is an insured under the policy. *Id.* at 477. The court noted that the plaintiff

might not have alleged facts in the complaint sufficient to establish its status as an insured

because such facts may not have been relevant to the merits or elements of the plaintiff's case.

*Id.* In permitting the use of extrinsic evidence to determine whether a duty to defend has been

triggered, the court in *Shearer* primarily was concerned about limiting a court's review to the

complaint. Later in the opinion, however, when discussing how to interpret the terms of an

insurance policy under Oregon law, the court did not include the use of extrinsic evidence. *Id.*

at 480. Instead, the court noted that if ambiguity survives after reviewing the text and context of

the disputed term and the policy as a whole, then a court construes against the drafter (the

insurer, and thus for expanded coverage). *Id.* at 480.

        Other decisions from the Oregon Court of Appeals, however, state that a court may not

look to extrinsic evidence when construing an insurance policy under Oregon law. *See, e.g.*,

*Rhiner v. Red Shield Ins. Co.*, 228 Or. App. 588, 593 (2009) ("In all events, the interpretation of

an insurance policy is a question of law that is confined to the four corners of the policy without

regard to extrinsic evidence."); *Employers Ins. of Wausau v. Tektronix, Inc.*, 211 Or. App. 485,

505 (2007) ("[E]xtrinsic evidence of the parties' intent is not part of the interpretation of an

insurance policy under Oregon law."); *Andres*, 205 Or. App. at 424 ("[T]he interpretation of

insurance policies is a question of law, not one that is resolved by reference to evidence extrinsic

to the policy itself."). The court in *Andres* noted that the Oregon Supreme Court has not

explained why when interpreting an insurance policy a court may not consider extrinsic evidence if an ambiguity exists after considering the text and context of the contract but must instead use the maxim of construction in favor of coverage, unlike when interpreting a non-insurance contract. *Andres*, 205 Or. App. at 424. These cases, however, did not involve the question of who is an "insured" under the policy.

The Court, however, need not decide whether it is appropriate under Oregon law to consider extrinsic evidence under the circumstances of this case, notwithstanding the parties' agreement that the Court may do so. Considering extrinsic evidence only further supports the Court's conclusion at step two that McClone's interpretation of the policy is the correct interpretation. The OCIP Manual explains that approved contractors and subcontractors obtain "coverage" through the OCIP and refers to "the issuance of *your* [the approved contractor's] insurance policy." ECF 24-1 at 7 (emphasis added). The Manual also states that payment under the Builder's Risk policy is coordinated by Intel because Intel is the "Trustee for *all* insured parties." *Id.* at 14 (emphasis added). This necessarily means that there are other insured parties besides just Intel and its affiliates, and the only reasonable implication and interpretation are that those other insured parties are the approved and enrolled contractors and subcontractors, who will receive their payment for loss from Intel or as directed by Intel.

Additionally, Factory Mutual, the insurer of the Builder's Risk policy, appears to have interpreted the Builder's Risk policy at issue as covering the damage because it paid the loss, although PERI argues that Factory Mutual paid the loss only as a "volunteer." Further, in responding to requests for admissions and interrogatories issued in this case, Factory Mutual acknowledged that: (1) McClone was automatically added to the Builder's Risk policy as an Insured after McClone's Certificate was issued (ECF 42-1); (2) under the OCIP, coverage is

provided for Intel plus enrolled contractors (ECF 35, Interrogatory Nos. 5 & 6); and (3) Factory

Mutual brings its claims as a subrogee of McClone and Turner and not as a subrogee of Intel

(ECF 35 at 13, RFAs 1-3). Factory Mutual's interpretation of the Builder's Risk policy is fully

consistent with McClone's interpretation that McClone is an "Insured" and is entitled to

coverage under the policy. The Court recognizes, however, that Factory Mutual has an interest in

making these concessions because if Factory Mutual paid merely as a "volunteer," that

conclusion would jeopardize Factory Mutual's claim against PERI.

### d.  Step Three: Construe in favor of expanded coverage

Step three of Oregon's framework for interpreting insurance contracts instructs a court to

construe the policy in favor of expanded coverage. *See Hamilton*, 332 Or. at 25; *Anderson

Bros.*, 729 F.3d at 931. This generally means construing the policy "against" the insurer. Here,

the insurer agrees with McClone's interpretation, which results in expanded coverage. Thus, the

policy is being construed as both the insurer and the purported insured argue it should be, namely

in the manner that results in expanded coverage. It is being construed "against" a third party that

is arguing for limited or restricted coverage.

This situation is distinguishable from the case in which a plaintiff who was not a party to

the insurance contract seeks coverage when the insurance company *denies* coverage. In such a

case, the Ninth Circuit has held that the presumption of construing an insurance policy against

the insurer is not warranted. *See, e.g.*, *Flexi-Van Leasing, Inc. v. Aetna Cas. & Sur. Co.*, 822

F.2d 854, 856 (9th Cir. 1987). Here, however, the insurance company does not deny coverage.

Thus, if the Court were required to move to step three, the Court would apply the doctrine

supporting expanded coverage and find that McClone is an insured under the policy.

**4. Conclusion**

The Court finds that McClone is an insured under Factory Mutual's Builder's Risk

policy. Thus, as conceded by PERI, the antisubrogation rule applies to bar PERI's contribution

claim. Accordingly, the Court grants summary judgment in favor of McClone on PERI's claim

against McClone for contribution.

**C. Duty to Defend and Indemnification**

The separate contract between McClone and PERI includes a contractual indemnification

clause. This clause provides that:

> INDEMNITY AND HOLD HARMLESS: You agree to indemnify
> and hold PERI harmless [from] any claim, liability or obligation
> (including the costs and attorneys' fees of any suit or claims
> related thereto) incurred by PERI as a result of persons being
> injured or property being damaged directly or indirectly in
> connection with the use of PERI's equipment to the extent arising,
> in whole or in part, from (i) The failure to follow or deviation by
> you or your agents or subcontractors from any design drawing
> provided by PERI; (ii) the use of PERI equipment, in whole or in
> part, in accordance with any design not provided by PERI; (iii) the
> negligent use of PERI equipment with materials not furnished by
> PERI or otherwise expressly approved in writing by PERI in
> advance of that use; (iv) your negligence and/or the negligence of
> your employees, contractors or agents and/or failure by any of the
> above to follow any applicable laws, rules, regulations, codes and
> standards relating to the use of the equipment and/or the operation
> of any jobsite.

ECF 24-7 at 15-16 ¶ 16.

McClone argues that its contractual duty to defend PERI or to provide indemnification

has not yet been triggered. McClone notes that Factory Mutual's Complaint does not allege that

McClone was negligent or otherwise improperly used PERI's equipment or designs. Thus,

argues McClone, PERI is not facing a claim for which the indemnification clause applies. PERI

responds that under Oregon law, it is not dispositive whether a complaint alleges that a purported

indemnitor is at fault, but only whether the complaint *could* allege facts that impose such

liability. In support of this proposition, PERI relies on *West Hills Development Co. v. Chartis Claims, Inc.*, 273 Or. App. 155 (2015). McClone responds to this argument by noting that Factory Mutual's Complaint could not make such allegations because of the antisubrogation rule.

The Court agrees with McClone that Factory Mutual's Complaint does not—and could not—allege that McClone is negligent or otherwise at fault because the antisubrogation rule would then preclude such a claim. Thus, the Court finds that McClone does not *currently* have a duty to defend or to indemnify PERI. *Cf. Hanover Ins. Co. v. Cummins Inc.*, 2016 WL 2858865, at *2 (N.D. W.Va. May 16, 2016) ("Cummins's allegations that FTS caused the fire and resulting damage is in essence an invocation of comparative fault, which Cummins may assert as a defense against Hanover and Liberty Mutual's claims as subrogees. In fact, Cummins has asserted comparative fault as a defense against the Subrogees. Thus, Cummins may not double-dip its comparative fault defense by maintaining a third-party claim for contribution or indemnification against FTS. . . . Taking the third-party complaint as true, the fire was caused by FTS's negligence and not by Cummins's negligence or by any manufacturing or design defect. Thus, through its third-party complaint Cummins is removing itself from the liability equation and alleging that only FTS is liable for the fire and the Subrogees' subsequent payouts under their insurance agreements. In effect, Cummins is attempting to convert this civil action into a dispute between insurer and insured. Thus, Cummins's third-party complaint seeks to create a conflict of interest between the Subrogees and FTS, and is not proper under the anti-subrogation rule.").

Accordingly, the Court grants summary judgment in favor of McClone on PERI's claim for indemnification. The Court expressly takes no position, however, on whether, if a factfinder, including the jury in this case, were to determine that McClone was negligent or otherwise at

fault for causing the concrete floor damage at issue in this case, PERI then might have a ripe claim for indemnification against McClone, at least for PERI's defense costs incurred in these proceedings.

## CONCLUSION

McClone's motion for summary judgment (ECF 23) is GRANTED, and PERI's third-party claims against McClone are dismissed.

**IT IS SO ORDERED**.

DATED this 12th day of December, 2016.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge